**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20-20029-01-DDC** |
| **MIGUEL ALONSO-GUTIERREZ (01),** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Defendant Miguel Alonso-Gutierrez has filed two separate amended motions asking the court to suppress evidence. The first is an Amended Motion to Suppress Search (Doc. 181). It seeks to suppress methamphetamine that law enforcement officers discovered after a warrantless search of Mr. Alonso-Gutierrez's truck. The second is an Amended Motion to Suppress Statements and the Consent to Search Mr. Alonso-Gutierrez's Telephone (Doc. 182). That motion argues that Mr. Alonso-Gutierrez didn't knowingly and intelligently waive his *Miranda* rights nor give officers voluntary consent to search his cell phone. And so, the motion urges, the court should suppress evidence of Mr. Alonso-Gutierrez's statements to officers, and any evidence discovered from the search of his cell phone. The government has filed separate responses to each motion. *See* Docs. 186 & 187. The court denies both of Mr. Alonso-Gutierrez's amended motions, for reasons explained below.

## I.    Background and Controlling Facts

The court held an evidentiary hearing on July 20, 2022, and unless otherwise noted, makes the following factual findings from the evidence presented on that date:

Around midday on February 28, 2020, a DEA Special Response Team converged on an AutoZone on Central Avenue in Kansas City, Kansas.  The target was an alleged drug-supplier, known only as "Biejon," who arrived at the AutoZone in a silver Honda Ridgeline.  The Special Response Team had planned a controlled drug purchase from Biejon through an individual who, the parties acknowledge, is a cooperating co-defendant in this case.  After partially executing the controlled buy, the Special Response Team swarmed the Honda Ridgeline.  They pinned the truck from behind with a DEA vehicle, deployed a noise flash diversionary device (an NFDD, more commonly known as a "flash-bang"),[1] broke the glass of the driver's side front window, and arrested Biejon—later identified as defendant Miguel Alonso-Gutierrez.  Officers then searched the Ridgeline and discovered two kilograms of methamphetamine in a shoebox in the truck's backseat.

Turning the clock back a few hours, during that morning, DEA Task Force Officer Kyle Twaddle and the Special Response Team were executing a search warrant on the residence of the cooperating co-defendant.  The cooperating co-defendant told officers that Biejon was his main drug supplier.  At that time, neither the cooperating co-defendant nor the officers knew that Biejon was Mr. Alonso-Gutierrez.  In fact, officers didn't even know about Biejon at all until that February morning.  After securing authority from the U.S. Attorney's Office to execute a controlled buy with Biejon, officers directed the cooperating co-defendant to set up the deal. The plan was for the cooperating co-defendant to repay $3,500 to Biejon—an actual drug debt he

---

[1]     DEA Task Force Officer Kyle Twaddle testified at the hearing that NFDDs, or "flash-bangs," are a tool that law enforcement sometimes uses to distract a suspect and keep both officers and a suspect safe while officials make the arrest.  He testified that the particular flash bang used in this case was a four-to-five-inch device with a removable pin.  To deploy this flash-bang, the user removes the pin and lobs it underhanded towards a hard surface.  The flash-bang then emits a bright light and a loud noise.  Officer Twaddle testified that the flash-bang used in this case is a new proprietary NFDD that is "safer" than a "traditional NFDD"—but he didn't explain why that's so.

already owed Biejon—in exchange for two kilograms of methamphetamine.  In officers'
presence, the cooperating co-defendant called Biejon and set up the deal.  The cooperating co-
defendant and Biejon agreed to meet at the nearby AutoZone within minutes—the two
apparently had met there before, and the cooperating co-defendant told Biejon he wasn't far
away.

The Special Response Team and the cooperating co-defendant then spent a few minutes
planning the controlled buy.  One officer would drive the cooperating co-defendant to the
AutoZone in the cooperating co-defendant's car.  They'd go inside the AutoZone.  And then,
when the cooperating co-defendant saw Biejon drive into the parking lot, he'd tip off the Special
Response Team, who would have set up surveillance nearby.  At that point, the cooperating co-
defendant would get in Biejon's car.  If he saw the two kilograms of methamphetamine, he
would leave the car under the guise of getting the money to pay the drug debt.  That move would
signal officers that indeed there was indeed methamphetamine in Biejon's car.  The team would
then move in and arrest Biejon.

Given that the Special Response Team essentially had no knowledge of Biejon, they
discussed how they should arrest him.  As Officer Twaddle testified at the hearing, the Special
Response Team was planning a controlled buy with an unknown, unidentified individual who
had arranged to collect a drug debt in exchange for a large quantity of methamphetamine.  The
team didn't know Biejon's criminal history, his prior interactions with law enforcement, nor
whether he carried a firearm.  But, in Officer Twaddle's experience, individuals trafficking large
amounts of narcotics often carry a weapon with them to drug sales.  So, to ensure everyone's
safety—meaning both the officers and Biejon himself—the team decided to pin the back of

Biejon's vehicle into place and deploy a flash-bang to distract him before they moved in for the arrest.

The Special Response Team then set up surveillance at the AutoZone.  Including Officer Twaddle, the Special Response Team included eight to 10 members.  Four or five surveillance vehicles (each containing one or two officers) also set up nearby.  Then, from the moment the cooperating co-defendant arrived on the scene, everything essentially went according to plan.  Biejon arrived in a silver Honda Ridgeline.  The cooperating co-defendant identified him and got in the truck with him for about a minute.  Then, the cooperating co-defendant got out of the truck, giving officers the prearranged signal that the methamphetamine was inside.  As explained above, the Special Response Team then pinned Biejon's truck from behind with a DEA van.  After ensuring no other individuals were around, one officer deployed a flash-bang on the passenger side of Biejon's truck.  Officers then broke in the front driver's side window[2] of the truck—apparently to ensure Biejon wasn't reaching for weapons—and arrested him.  He was the only person in the truck.  Officers then immediately searched the truck.  In a shoebox on the floorboard in the rear passenger seat, they discovered a substance later identified as two kilograms of methamphetamine.

The Special Response Team arrested Biejon around 12:42 p.m.  Shortly afterwards, they removed him to a second location—the National Guard Armory several blocks away from the AutoZone.  Officer Twaddle explained that they typically try to relocate the investigation so it will not interfere with nearby businesses.  At that time, officers still didn't know who Biejon

---

[2]        It's unclear why officers broke the truck's front driver's side window.  At the hearing, Officer Twaddle testified that officers sometimes do this when the windows are tinted and it's difficult to see what a suspect is doing.  Regardless, there's no evidence that Mr. Alonso-Gutierrez was injured by any broken glass.  And, he doesn't contend that the officers' decision to break the window rendered the search unreasonable.  Instead, as discussed more below, he focuses on the officers' choice to deploy the flash-bang on the truck's passenger side.

was.  They tried to learn his identity, but Biejon only speaks Spanish.  And, apparently, no one at the scene spoke Spanish.  So, officers contacted Detective George Lozano, who worked with the Northeast Kansas Multi-Jurisdictional Drug Task Force.  Detective Lozano is a bilingual native Spanish speaker.  As he testified at the hearing, he's often called in to translate in situations with individuals who only speak Spanish.  Detective Lozano arrived at the National Guard Armory around 1:15 p.m.—about half an hour after officers had arrested Biejon.  At that time, Detective Lozano introduced himself to Biejon—who identified himself as Miguel Alonso-Gutierrez.

Detective Lozano then provided Mr. Alonso-Gutierrez with his *Miranda* rights. Detective Lozano gave Mr. Alonso-Gutierrez a form—written in Spanish—that both specified the various *Miranda* rights and provided a space where individuals could acknowledge that they understood their rights but waived them and were willing to answer questions from officers. Detective Lozano read the form to Mr. Alonso-Gutierrez and gave him the form to read himself. Mr. Alonso-Gutierrez then signed the form, acknowledging that he understood his *Miranda* rights, waived them, and willingly would speak with officers.  He also told Detective Lozano verbally that he understood his rights and that he was waiving them by speaking with him.  At the hearing, Detective Lozano testified that he didn't observe any sign that Mr. Alonso-Gutierrez was confused or didn't understand what was happening.  Detective Lozano testified that Mr. Alonso-Gutierrez didn't appear injured, nor did he appear to have any difficulty hearing.  The government introduced a copy of the Spanish version of the *Miranda* waiver form that Mr. Alonso-Gutierrez signed at 1:15 p.m. that afternoon.

All of this happened inside a van at the National Guard Armory.  So, shortly after 1:15 p.m., Detective Lozano asked if Mr. Alonso-Gutierrez would come to the DEA's district office to continue the interview.  Mr. Alonso-Gutierrez agreed.  They arrived at the district office

around 2:00 p.m.—about 45 minutes after Detective Lozano had *Mirandized* Mr. Alonso-Gutierrez. At that time, Detective Lozano asked Mr. Alonso-Gutierrez if officers could search his cell phone. Detective Lozano provided Mr. Alonso-Gutierrez with a search consent form—but this time the form was in English. Detective Lozano testified that he discussed the search consent form with Mr. Alonso-Gutierrez in Spanish and that Mr. Alonso-Gutierrez appeared to understand the meaning and significance of the form. Mr. Alonso-Gutierrez signed the consent form at 2:00 p.m. Detective Lozano again testified that, at that time, Mr. Alonso-Gutierrez never indicated that he didn't understand what was happening.

Mr. Alonso-Gutierrez now moves to suppress the methamphetamine discovered in the truck. He mainly challenges officers' use of the flash-bang while affecting the arrest as an unreasonable use of force that violated the Fourth Amendment. He also moves to suppress his statements to law enforcement, as well as evidence discovered from the search of his cell phone. In his view, he didn't knowingly and intelligently waive his *Miranda* rights nor knowingly and intelligently consent to his cell phone's search. The court considers these arguments, in turn, below.

## II. Motion to Suppress Search (Doc. 181)

The Fourth Amendment forbids unreasonable searches and seizures. *Bailey v. United States*, 568 U.S. 186, 192 (2013). Searches "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). If a defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove the reasonableness of that search or seizure by a preponderance of the evidence. *See*

*United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).  If the court determines the search or seizure violated the Constitution and the law enforcement activity was not objectively reasonable, the court, with few exceptions, must suppress the fruits and instrumentalities of the challenged search or seizure. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

Officers conducted a warrantless search of Mr. Alonso-Gutierrez's truck.  Nevertheless, the government argues the search fell within several well-established exceptions to the Fourth Amendment's warrant requirement.  The court addresses just two of those exceptions because they're dispositive and each one provides a separate and independent reason to deny Mr. Alonso-Gutierrez's motion.  Specifically, the warrantless search of Mr. Alonso-Gutierrez's truck was constitutional for two separate and independent reasons:  (1) the automobile exception; and (2) the search incident to arrest exception.  The court addresses the two exceptions, in turn, below. Then, the court turns to Mr. Alonso-Gutierrez's argument that it was unreasonable for officers to deploy a flash-bang before they arrested him.

### A.      Automobile Exception

The "automobile exception" to the Fourth Amendment's warrant requirement allows officers to search a vehicle without a warrant if the officers have "probable cause to believe that the vehicle contain[s] evidence of crime[.]"  *California v. Acevedo*, 500 U.S. 565, 569 (1991) (citing *Carroll v. United States*, 267 U.S. 132, 158–59 (1925)); *see also United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007).  "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."  *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (quotation cleaned up).  "Once probable cause to search is established, the officer may

search the entire vehicle, including the trunk and all containers therein that might contain contraband." *Id.* at 1160; *see also United States v. Edwards*, 632 F.3d 633, 645 (10th Cir. 2001) ("[I]f there is probable cause to search a vehicle, the police are allowed to search any package within the vehicle that is capable of concealing the object of the search.").

The automobile exception applies to the facts of this search.  Officers set up a controlled buy of two kilograms of methamphetamine from Mr. Alonso-Gutierrez at the AutoZone through the cooperating co-defendant.  When Mr. Alonso-Gutierrez arrived at the AutoZone in a silver Honda Ridgeline, the cooperating co-defendant recognized him and pointed him out to officers. The cooperating co-defendant got in the Ridgeline with Mr. Alonso-Gutierrez, and then left the truck to get money for the purchase—the prearranged signal to officers that there was methamphetamine in the truck.  At that point, officers—who had observed all this conduct—had probable cause to believe there was methamphetamine in the truck.  And so, under the automobile exception they didn't need a warrant to search the truck nor the black shoebox in the backseat of the truck, which contained the methamphetamine.  *Bradford*, 423 F.3d at 1160; *Edwards*, 632 F.3d at 645.  The search was constitutional, and suppression isn't justified.

### B.      Search Incident to Arrest Exception

The search of the truck also was constitutional for a second and independent reason. Under *Arizona v. Gant*, officers can conduct a warrantless "search incident to a lawful arrest" of a vehicle's recent occupant "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  556 U.S. 332, 343 (2009) (quotation cleaned up).  In some situations, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein."  *Id.* at 344.

This case presents such a situation. Here, officers lawfully arrested Mr. Alonso-Gutierrez. As explained above, they had probable cause to believe Mr. Alonso-Gutierrez was committing a drug offense: the cooperating co-defendant had arranged a controlled buy with Mr. Alonso-Gutierrez and he showed up at the agreed-upon location for the buy, *i.e.*, the AutoZone. Then, after officers removed Mr. Alonso-Gutierrez from his truck and arrested him for the drug offense, they had probable cause to believe the truck would contain evidence of that offense. Under *Gant*, officers could search the truck and all its containers without a warrant. 556 U.S. at 343–44. The search thus was constitutional for this second, independent reason.

### C.    Officers' Use of the Flash-Bang

Resisting the conclusion that the warrantless search of the truck was constitutional, Mr. Alonso-Gutierrez argues the use of the flash-bang device was unnecessary, and thus, unreasonable under the Fourth Amendment. So, he argues, the court should suppress the methamphetamine. The court rejects this argument. Nothing about officers' use of the flash-bang affects the conclusion that the warrantless search was permissible. The court doesn't express an opinion about whether the flash bang was necessary under the circumstances. That's better left to experienced law enforcement officers. But it wasn't unreasonable. As a result, the court won't suppress the methamphetamine merely because officers used a flash-bang shortly before they discovered it.

There is scarce case law in our Circuit about officers' use of flash-bangs. But, in what appears as the leading case on the issue, the Circuit focused on whether law enforcement's "actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Kirk v. Watkins*, 182 F.3d 932 (table), 1999 WL 381119, at *3

(10th Cir. June 11, 1999) ("The use of a flashbang device is neither per se objectively reasonable nor unreasonable.  The reasonableness of its use depends on the facts and circumstances of each case.").  In *Myers*, the Circuit held that officers' use of a flash bang was not "objectively unreasonable" given that officers knew defendant had a history of illegal drug trafficking and had spent time in federal prison for fire-bombing a jail or police vehicle.  106 F.3d at 940.  This information rendered officers' use of the flash-bang during a search objectively reasonable— even though defendant's "innocent and unsuspecting" children and wife were in the house asleep at the time.  *Id.*  The latter fact, *i.e.*, the presence of the children and wife, gave the Circuit "great pause[,]" but it wasn't enough to render the use of the flashbang objectively unreasonable given the defendant's "lengthy pattern of criminal activity[.]"  *Id.*; *see also Kirk*, 1999 WL 381119, at *3–4 (expressing a "precautionary attitude toward the use of [flash-bang] devices" after *Myers* but holding that use under the circumstances was reasonable where officers had reasonable belief that defendant had a reputation for violence).

Applying that governing standard to the situation here, officers' use of the flash bang was objectively reasonable.  Officer Twaddle testified that the Special Response Team discussed using the flash-bang before arriving at the AutoZone because they didn't know anything about Mr. Alonso-Gutierrez.  They didn't know his real name, and so, they didn't know about any potential criminal history, or whether he was dangerous.  All they knew was that he had agreed to exchange two kilograms of methamphetamine for repayment of a $3,500 drug debt.  In Officer Twaddle's experience, a seller of that level of drug quantity typically carries a firearm or weapon with him.  So, under those circumstances, Officer Twaddle testified, Mr. Alonso-Gutierrez could've presented a threat to officers.  And so, Officer Twaddle continued, the Special Response Team determined the best course was to distract Mr. Alonso-Gutierrez with a flash-

bang—both to ensure his quick arrest, as well as protect his safety and that of the other officers. The court finds this justification was reasonable. Add to the calculus that the detonating officer deployed the flash-bang outdoors on the truck's passenger side—away from Mr. Alonso-Gutierrez—after ensuring there were no private citizens nearby in the AutoZone parking lot. Under all those circumstances—that (1) officers knew virtually nothing about Mr. Alonso-Gutierrez except that he had agreed to sell a large quantity of methamphetamine in exchange for repayment of a substantial drug debt, (2) officers needed to ensure their safety, and (3) that the detonating officer ensured there was no one around when he deployed the flash bang—the court finds officers' use of the flashbang was objectively reasonable under all attendant circumstances. *See Hernandez v. Conde*, 442 F. Supp. 2d 1141, 1157 (D. Kan. 2006) (finding "that the use of flash grenades was reasonable" based on "information the officers were aware of"—including "1) the sale of narcotics earlier in the day allegedly at the residence; 2) information that the occupants were mid-to high-level drug dealers; 3) the lack of information as to whether weapons were available in the trailer; 4) the traffic observed at the trailer; . . . 5) the lack of information about the layout of the home or the number of residents" and (6) "officers were aware that weapons may be present in places where drug transactions occurred"). Thus, the court concludes that the Special Response Team's use of the flash bang provides no reason to suppress the seized methamphetamine. The court denies Mr. Alonso-Gutierrez's first Motion to Suppress (Doc. 181).

## III.    Motion to Suppress Statements and Consent to Search Cellphone (Doc. 182)

Mr. Alonso-Gutierrez's second suppression motion consists of two components. The first targets the waiver of his *Miranda* rights. The second challenges his consent to the cell phone search. The court takes up each argument, below.

A.      *Miranda* Waiver

After officers inform a suspect of his *Miranda* rights,[3] the suspect "may waive . . . these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "To establish a waiver of Fifth Amendment rights, the government must show:  (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). "Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective." *Id.*  Under *Miranda*, a law enforcement officer's "failure to give the prescribed warnings" and secure "a waiver of rights before custodial questioning generally requires exclusion of any statements" made. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). "Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility[.]" *Id.* at 608–09.

Mr. Alonso-Gutierrez argues that he didn't knowingly and intelligently waive his *Miranda* rights.  And so, he urges, the court should suppress all of his statements to law enforcement.  Mr. Alonso-Gutierrez advances two arguments against his *Miranda* waiver. Neither are persuasive.

*First*, Mr. Alonso-Gutierrez argues that officers should've interviewed him using a court-approved translator, rather than an officer who spoke Spanish, *i.e.*, Detective Lozano.  But he cites no authority for this argument, the government says it isn't aware of any, and the court also

---

[3]      "Prior to any questioning, the [accused] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

can find none.  In at least three separate opinions, however, the Tenth Circuit noted that a

Spanish-speaking officer had conducted an interview with a defendant or third-party who

provided the requisite consent to a search.  *See United States v. Iribe*, 11 F.3d 1553, 1557–58

(10th Cir. 1993); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1567 (10th Cir. 1993);

*United States v. Quezada-Lara*, 831 F. App'x 371, 380 (10th Cir. 2020).  The Tenth Circuit

didn't disapprove or express any reservations about that procedure in any of those cases.  The

court thus has no reason to find any issue with Detective Lozano—rather than a court-approved

translator—conducting the interview with Mr. Alonso-Gutierrez.

 *Second*, Mr. Alonso-Gutierrez argues that the flash-bang disoriented him, and, as a result,

he didn't knowingly and intelligently waive his *Miranda* rights, making his statements to law

enforcement involuntary.  As discussed above, there's scarce authority in our Circuit discussing

use of flash-bangs.  Fortunately, there's a decision from the Seventh Circuit directly addressing

this issue—and it squarely rejects Mr. Alonso-Gutierrez's argument.  In *United States v. Morris*,

349 F.3d 1009, 1013 (7th Cir. 2003), the Seventh Circuit rejected a defendant's argument that

"he confessed because of the flash-bang device" because no evidence supported that contention.

To the contrary, officers testified that defendant's statements "were made in a 'chatty' manner"

and that "there was nothing about [defendant's] manner or speech that suggested he was

confused or disoriented." *Id.*  Also, defendant had "confessed a total of four times to five

separate law enforcement officers and as late as six months after the flash-bang device was

used." *Id.*; *see also United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000) ("[Defendant's]

statement similarly is admissible, for his custody was lawful, and he does not contend that 30

minutes after the entry he was still so disoriented by the explosion that the statement was

involuntary.").

Here, Mr. Alonso-Gutierrez signed the *Miranda* waiver and began speaking with law enforcement about 30 minutes after the flash-bang device's flash and bang had dissipated. There's no evidence that Mr. Alonso-Gutierrez was disoriented by the flash-bang at all, let alone 30 minutes after officers had deployed it. To the contrary, Detective Lozano testified that when he provided Mr. Alonso-Gutierrez with his *Miranda* rights—and when Mr. Alonso-Gutierrez chose to waive them—there was no sign that Mr. Alonso-Gutierrez was disoriented. Mr. Alonso-Gutierrez didn't say he had trouble hearing. Nor did he demonstrate a misunderstanding of his *Miranda* rights or his choice to waive them. According to Detective Lozano's testimony, Mr. Alonso-Gutierrez fully understood his rights and his choice to waive them. The court finds that testimony credible. And Mr. Alonso-Gutierrez adduced no evidence to contradict it.

Also, importantly, the *Miranda* waiver form was written entirely in Spanish, the only language that Mr. Alonso-Gutierrez speaks. Detective Lozano verbally read the form to Mr. Alonso-Gutierrez in Spanish. And Mr. Alonso-Gutierrez read the form to himself. He then signed it, acknowledging his rights and waiving them. Under these circumstances, the court concludes that Mr. Alonso-Gutierrez's *Miranda* waiver was both knowing and intelligent. Thus, his statements to law enforcement were voluntary, and suppression isn't justified on this basis.

### B.     Consent to Cellphone Search

Finally, Mr. Alonso-Gutierrez argues that he didn't consent voluntarily to officers' search of his cell phone. The government has the burden to prove that Mr. Alonso-Gutierrez's consent was voluntary. *Iribe*, 11 F.3d at 1557 (explaining that the "government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given" (quotation cleaned up)). The government has shouldered that burden here.

To begin, there's no merit to Mr. Alonso-Gutierrez's argument that his consent was involuntary because officers didn't tell him that he could refuse consent. Officers don't have to tell individuals about their right to refuse consent. "The [Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *United States v. Drayton*, 536 U.S. 194, 206 (2002); *see also Quezada-Lara*, 831 F. App'x at 379 (recognizing that "'knowledge of the right to refuse consent' is not 'a necessary prerequisite to demonstrating a "voluntary" consent'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 232–33 (1973))).

Moving to the main argument, Mr. Alonso-Gutierrez highlights that the search consent form he signed was in English—and he only speaks Spanish. But, at the hearing, Detective Lozano testified that he explained the form to Mr. Alonso-Gutierrez in Spanish. He also testified that Mr. Alonso-Gutierrez appeared to understand his rights, as well as his choice to waive them. The court finds this testimony credible. And Mr. Alonso-Gutierrez didn't adduce any meaningful contrary evidence at the hearing. To be sure, Mr. Alonso-Gutierrez's counsel raised a slight doubt about Detective Lozano's translations on cross-examination. When counsel asked Detective Lozano to translate a line on the Spanish *Miranda* waiver form into English, Detective Lozano stumbled through part of his translation—though he ultimately translated the sentence into Spanish. But this moment of difficulty during the hearing doesn't change the court's conclusion about Detective Lozano's credibility. For one, the court recognizes that translating on the spot during cross-examination is no easy task. For another, at the hearing, Detective Lozano translated the Spanish *Miranda* waiver form into English. The issue here, however, is the adequacy of Detective Lozano's translation of the English search consent form into Spanish. Thus, while Detective Lozano's live translation certainly was the hearing's most dramatic

moment, it doesn't ultimately nullify the court's larger finding that his testimony was credible. The court accepts Detective Lozano's testimony that he translated the English search consent form into Spanish, and that Mr. Alonso-Gutierrez understood that translation.

Under those circumstances, the court finds that Mr. Alonso-Gutierrez's consent to the cellphone search was knowing, intelligent, and voluntary. *See Iribe*, 11 F.3d at 1557 (concluding that third-party intelligently gave consent to search even though the consent "form was written in English," because officer explained the form to individual "when he translated the form into Spanish"); *see also Rodriguez-Garcia*, 983 F.2d at 1567 (same).  Officers properly searched Mr. Alonso-Gutierrez's cellphone.  The court thus denies Mr. Alonso-Gutierrez's second Motion to Suppress (Doc. 182).

## IV.    Conclusion

For reasons explained above, the court denies both of Mr. Alonso-Gutierrez's suppression motions (Docs. 181 & 182).  The warrantless search of his truck was constitutional, and nothing about the flash-bang changes that result.  Also, Mr. Alonso-Gutierrez's *Miranda* waiver, and his consent to search the cell phone both were knowing, intelligent, and voluntary.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Miguel Alonso-Gutierrez's "Amended Motion to Suppress Search" (Doc. 181) and "Amended Motion to Suppress Statements and the Consent to Search His Telephone" (Doc. 182) are denied.  **The court sets a status conference for September 1, 2022, at 9:00 a.m.**

**IT IS SO ORDERED.**

**Dated this 19th day of August, 2022, at Kansas City, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**